IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
NORTHERN DIVISION

**MAVERICK PARKS**                                                                                       **PLAINTIFF**

V.                                              No. 3:22-cv-00138-JTK

**COMMISSIONER of**
**SOCIAL SECURITY ADMINISTRATION**                                              **DEFENDANT**

**ORDER**

**I. Introduction:**

Plaintiff Maverick Parks applied for disability benefits on February 7, 2020, alleging disability beginning on December 19, 1996. (Tr. at 11). His claim was denied initially and upon reconsideration. *Id*. After conducting a hearing, the Administrative Law Judge ("ALJ") denied Parks's application on September 27, 2021. (Tr. at 22). The Appeals Council later denied his request for review. (Tr. at 1). The ALJ's decision now stands as the final decision of the Commissioner, and Parks has requested judicial review.

For the reasons stated below, the Court[1] reverses and remands the ALJ's decision.

**II. Background:**

Parks was born on December 19, 1996, and was 24 years old at the time of the ALJ hearing in May 2021. (Tr. at 31). In his application, Parks alleged that he is unable to work due to intellectual disability (historically termed "mental retardation").[2] He reported that his disability

---

[1] The parties have consented in writing to the jurisdiction of a United States Magistrate Judge. *Doc. 4*.

[2] Some of Parks's records describe a diagnosis of "mild mental retardation," which is associated with an "IQ level 50–55 to approximately 70." *Lott v. Colvin*, 772 F.3d 546, 547 n.2 (8th Cir. 2014) (quoting American Psychiatric Association (APA), *Diagnostic and Statistical Manual of Mental Disorders* 42 (4th ed., text rev. 2000) (DSM–IV–TR)). "The APA's . . . *Diagnostic and Statistical Manual of Mental Disorders* 33, 37 (5th ed. 2013) (DSM–V), replaces

makes it difficult for him to understand things—for instance, he can't read or write well, and he can't count change. (Tr. at 216). Parks received special education services throughout his entire school career before graduating in 2016. (Tr. at 31-32, 276).

Parks could not recite his full address at the ALJ hearing, but he lives with his parents in Jonesboro, Arkansas. (Tr. at 30-31). He has never had a job or lived on his own. (Tr. at 31). He has never driven a vehicle. (Tr. at 32). His parents prepare his meals for him, but if they are not home, he is able to use the microwave. (Tr. at 35, 218). He doesn't often leave the house, but his parents will sometimes drive him to the store and go inside with him. (Tr. at 33). On a typical day, he enjoys playing video games, listening to music, and watching TV. (Tr. at 34). Parks told the ALJ that he is not responsible for any household chores. (Tr. at 33, 35-36). Although he sometimes takes out the trash, he often forgets to do it. (Tr. at 37). He believes that if he had a job, he could not complete a full workday without being reminded to do things. *Id*.

After Parks gave his testimony at the hearing, the ALJ determined his residual functional capacity ("RFC"), and a vocational expert ("VE") testified that a person with Parks's RFC would be able to perform a significant number of jobs in the national economy.

Following the hearing, the ALJ issued a written decision, following the five-step sequence used to determine a claimant's eligibility for benefits.³ The ALJ found that Parks had not engaged

---

the term 'mental retardation' with 'intellectual disability' and removes IQ score from the diagnostic criteria. . . ." *Id*. (quoting *Sasser v. Hobbs*, 735 F.3d 833, 843 n.4 (8th Cir. 2013)).

³ The evaluation process requires that the ALJ determine: (1) whether the claimant was engaged in substantial gainful activity; (2) if not, whether the claimant had a severe impairment; (3) if so, whether the impairment (or combination of impairments) met or equaled a listed impairment; (4) if not, whether the impairment (or combination of impairments) prevented the claimant from performing past relevant work; and (5) if so, whether the impairment (or combination of impairments) prevented the claimant from performing any other jobs available in significant numbers in the national economy. 20 C.F.R. § 416.920(a)–(g).

in substantial gainful activity since the application date of February 7, 2020.[4] (Tr. at 13). He then found that Parks's intellectual disability is a severe impairment, but that it fails to meet or equal the severity of any impairment listed in 20 C.F.R. Pt. 404, Subpt. P, App. 1 ("Listing of Impairments," or "the listings"). (Tr. at 13-17). The ALJ determined that Parks has the RFC to perform a full range of work at all exertional levels, with the following nonexertional limitations: (1) all interpersonal contact must be incidental to the work performed; (2) the complexity of tasks is learned and performed by rote, with few variables and requiring little independent judgment; (3) the supervision required is simple, direct, and concrete; (4) no dealing with the general public; and (5) no tasks that require the taking down of written orders or the making of change, such as a restaurant server or cashier. (Tr. at 17). The ALJ found that Parks has no past relevant work he can perform, but that Parks's age, education, work experience, and RFC would allow him to perform jobs existing in significant numbers in the national economy, including jobs such as trash collector and crate icer. (Tr. at 22). Therefore, the ALJ concluded that Parks is not disabled. *Id*.

### III.  Standard of Review:

The Court's function on review is to determine whether the Commissioner's decision is supported by substantial evidence on the record as a whole and whether it is based on legal error. *Miller v. Colvin*, 784 F.3d 472, 477 (8th Cir. 2015); *see also* 42 U.S.C. § 405(g). While "substantial evidence" is that which a reasonable mind might accept as adequate to support a conclusion, "substantial evidence on the record as a whole" requires a court to engage in a more scrutinizing analysis:

> "[O]ur review is more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision; we also take into account whatever in the record fairly detracts from that decision." Reversal is not

---

[4] For supplemental security income claims, the relevant time period begins on the date the application was filed. 20 C.F.R. §§ 416.335, 416.920.

warranted, however, "merely because substantial evidence would have supported an opposite decision."

*Reed v. Barnhart*, 399 F.3d 917, 920 (8th Cir. 2005) (citations omitted).

In clarifying the "substantial evidence" standard applicable to review of administrative decisions, the Supreme Court has explained: "And whatever the meaning of 'substantial' in other contexts, the threshold for such evidentiary sufficiency is not high. Substantial evidence . . . is 'more than a mere scintilla.'" *Biestek v. Berryhill*, 139 S. Ct. 1148, 1154 (2019) (quoting *Consol. Edison Co. v. NLRB*, 59 S. Ct. 206, 217 (1938)). "It means—and means only—'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Id*.

**IV.   Summary of the Evidence:**

In 2016, Parks graduated from Valley View High School, where he was enrolled in special education classes. (Tr. at 31, 276). His school records show that as a high school senior, he was unable to read on his own or to understand directions without someone reading them orally. (Tr. at 331). His reading comprehension was at a fourth-grade level (with the passage read aloud), and he was doing math at a third-grade level with accommodations. (Tr. at 329). He was unable to express his thoughts and ideas in writing, and his word recognition skills were assessed at the second-grade level. *Id*.

While Parks was in school, he received therapy and medication management services through Families, Inc. (Tr. at 340-450). He reported pervasive problems with anger, aggression, hyperactivity, inattention, and impulsive behaviors, along with some recurrent episodes of excessive eating. (Tr. at 436-45). It was noted that he suffered from failure to thrive, was a little slow, and had mild mental retardation. He was diagnosed with ADHD (combined type) with symptoms of failing to give close attention to details, difficulty sustaining attention, not appearing to listen when spoken to, poor follow-through with instructions, failure to finish schoolwork and

4

chores, difficulty organizing, losing items necessary to complete tasks, leaving his seat when expected to remain seated, and difficulty playing or engaging in leisure activities. He was also diagnosed with adjustment disorder with mixed disturbance of emotions and conduct. His treatment provider noted social problems and found that he was unable to care for himself as would be expected based on his age. The counselors and school officials who worked with Parks throughout high school consistently described him as polite, friendly, and cooperative.

Shortly before graduation, Parks's special education teacher, Kelly Green, completed a Summary of Performance ("SOP") document, which described Parks's academic achievement and functional performance and provided recommendations on how to assist him in meeting his postsecondary goals. (Tr. at 328-32, 337). In the cognitive area of Attention and Executive Functioning, Ms. Green wrote that Parks "is only able to sustain attention [for] 5 minutes on a task that is not of his choosing. Adult supervision is required to accomplish executive functioning. [Parks] needs reinforcements once a skill[] has been taught to keep that particular skill[]. His level of activity is high and he is very motivated." (Tr. at 329). In the area of General Ability and Problem Solving, she wrote that Parks "is able to make reasonable decisions and is able to process information, but lacks those skills in age appropriate situations." *Id*. Regarding Parks's Independent Living Skills, Ms. Green stated that Parks could care for himself and make decisions about what he wanted to do during leisure activities, but that he needed assistance in the areas of personal safety, transportation, banking, monthly bills, and budgeting—resulting in the need for adult supervision. (Tr. at 330). However, she also wrote that Parks was capable of working and willing to learn. She recommended that Parks could hold a full-time job "with assistance from a job coach or supportive employment." (Tr. at 331).

On November 10, 2015, in connection with a prior application for benefits, Parks met with consultative examiner Anita Gail Wells, Ph.D., for a mental diagnostic evaluation and intellectual assessment. (Tr. at 257-65). Parks was 18 years old and a senior in high school at the time. During the interview, Parks reported that he did not buy groceries but could pay for store items independently: "I do that for Mary all the time . . . I get her gas for her . . . and tell them what car it is . . . or what truck . . . ain't that hard." (Tr. at 259). He reported that he did not clean the house or do laundry, but said, "I do make my bed some of the time. They caught me. I used to not do it. But they caught me. I used to be on the Newspaper; like people come to our school; took a picture of us. They caught me doing it; making my bed . . . my school bed." (Tr. at 259-60). Dr. Wells noted that Parks had an immature affect and a mild to moderate speech impairment, pronouncing three as "free." She described his appearance as "somewhat peculiar," and noted that his eyes seemed "distorted; almost crossed." (Tr. at 259). He reported that he wore glasses every day but failed to bring them that morning.

Intelligence testing at that evaluation resulted in a full scale IQ score of 66, which Dr. Wells associated with a level of intellectual efficiency in the extremely low to borderline range. She found that Parks's overall adaptive functioning appeared to be in the borderline range and that he had not demonstrated adequate independent living skills. Still, she found no evidence of inability to cope with the mental/cognitive demands of basic work-like tasks. She reported that Parks appeared to have adequate attention and concentration during the evaluation and appeared capable of completing school or work-like tasks within an acceptable timeframe. However, she opined that Parks "would likely [fare] better in a well-supervised and supportive environment." (Tr. at 265).

Parks was examined again on August 12, 2020—when he was 23 years old—in conjunction with the current application for benefits. (Tr. at 267-73). Consultative psychological examiner

6

Catherine H. Terrell, Ph.D., described Parks's "facial and bodily features [as] representative of someone with a chromosomal abnormality, low-set eyes down-turned at the outside corners, oblong-shaped face and poor muscle tone in gait and when sitting, among others." (Tr. at 270). She first spoke to Parks alone, then met with his stepfather at the end of the interview. Parks told Dr. Terrell that he does not go into the grocery store by himself and requires assistance from others. His stepfather explained that Parks's previous stepfather, who had been very involved in teaching Parks to be productive, had passed away. After his stepfather's death, Parks's family had not done much to continue those efforts. His new stepfather reported that "they are working on [Parks] going into the store by himself right now." (Tr. at 269). Parks told Dr. Wells that he had failed the driving exam five times. When Dr. Terrell suggested getting accommodations for the driving exam, Parks's stepfather expressed doubts about Parks's readiness to drive. In his opinion, Parks was not experienced or mature enough to handle driving decisions.

Dr. Terrell diagnosed Parks with intellectual disability based on "his low IQ coupled with his limited ability to complete ADLs [activities of daily living] without assistance." (Tr. at 272). She found that Parks's "difficulties seem to interfere with age-appropriate ADLs such as relationships, driving, managing money, and grocery shopping." *Id*. She found that Parks "was immature and required explanation for many instructions that would have been easily understood for someone his age with no limitations." (Tr. at 272-73). She opined that Parks has severe difficulty attending and sustaining concentration on basic tasks, and moderate to severe difficulty coping with work-type demands, sustaining persistence in completing tasks, and completing tasks within an acceptable timeframe. Like Dr. Wells, she concluded that Parks "seems best fit for a supervised work experience, such as a sheltered workshop or the like." (Tr. at 272).

V. **Discussion:**

Parks contends that substantial evidence does not support the ALJ's decision to deny benefits. He argues that the ALJ should have found him disabled at Step Three because his impairment meets the criteria in Listing 12.05B for intellectual disorder.[5] The Commissioner, in response, argues the ALJ correctly determined that Parks failed to satisfy the listing.

"The listings define impairments that would prevent an adult, regardless of his age, education, or work experience, from performing *any* gainful activity, not just 'substantial gainful activity.'" *Sullivan v. Zebley*, 493 U.S. 521, 532 (1990). If a claimant is not working and his impairment meets the criteria for a listed impairment, "he is presumed unable to work and is awarded benefits without a determination whether he actually can perform his own prior work or other work." *Id*. The claimant bears the burden of proving that his impairment meets the listing. *Johnson v. Barnhart*, 390 F.3d 1067, 1070 (8th Cir. 2004).

To meet Listing 12.05B, Parks must satisfy three requirements. First, he must demonstrate "[s]ignificantly subaverage general intellectual functioning." 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.05B1 ("Listing 12.05B1").[6] A full scale IQ score of 70 or below on a standardized general intelligence test satisfies this requirement. *Id*. Second, Parks must demonstrate "[s]ignificant deficits in adaptive functioning" across four specific areas of mental functioning (also known as the "paragraph B criteria"). Listing 12.05B2. This requirement is met where the evidence shows an "extreme" limitation of one area or a "marked" limitation of two areas. Third, the evidence

---

[5] The disorder evaluated in this listing "may be described in the evidence as intellectual disability, intellectual developmental disorder, or historically used terms such as 'mental retardation.'" 20 C.F.R. Pt. 404, Subpt. P, App. 1 § 12.00B4. A claimant may meet the listing by satisfying the requirements in either 12.05A or 12.05B. Because Parks does not argue he met Listing 12.05A, the Court limits its review accordingly.

[6] All "Listing" references that follow refer to specific sections of the Listing of Impairments located in Appendix 1 to Subpart P of Part 404.

about Parks's current functioning and about the history of his intellectual disorder must demonstrate or support the conclusion that the disorder began before the age of 22. Listing 12.05B3. The Commissioner concedes that Parks has demonstrated significantly subaverage intellectual functioning before age 22, satisfying both the first and third requirements of Listing 12.05B. *Doc. 18 at 1*.

As for the second requirement, the ALJ found that Parks exhibited "moderate" limitations in functioning across all four areas of mental functioning. This rating corresponds to a finding that Parks's "functioning in [each] area independently, appropriately, effectively, and on a sustained basis is fair." Listing 12.00F2c. Parks challenges the ALJ's findings across three areas: understanding, remembering, or applying information; concentrating, persisting, or maintaining pace; and adapting and managing oneself. The ALJ's findings relevant to the three challenged areas are as follows:

> In understanding, remembering, or applying information, the claimant has a moderate limitation. The claimant reported problems following instructions, but he has the mental capacity to complete such tasks as attending to his personal care, preparing microwavable meals, and operating and playing video games. Further, transcripts from high school show the claimant was generally a B student, with a cumulative grade point average of 3.58. In addition, treating providers in the past have routinely described the claimant as having normal flow of thought. Moreover, during a recent consultative examination, the claimant had problems with memory and recall but normal thought processes.
>
> *****
>
> With regard to concentrating, persisting, or maintaining pace, the claimant has a moderate limitation. The claimant reported problems paying attention, but the record shows that the claimant engages in many activities of daily living that invariably call for some degree of concentration including preparing microwaveable meals, shopping in stores, playing video games, and sustaining sufficient attention and concentration to follow a television program. Furthermore, treating providers in the past have routinely described the claimant as attentive. Moreover, during a recent consultative examination, the claimant was described as alert and fully oriented in all spheres.

> As for adapting or managing oneself, the claimant has experienced a moderate limitation. The claimant reported no mental difficulty bathing, dressing, or completing aspects of his personal hygiene, and he reported he is capable of managing his daily routine without significant assistance from others, including preparing microwavable meals and shopping in stores but he does need help managing his finances and he does not drive. Moreover, treatment notes routinely indicated he had appropriate affect during exams.
>
> The above evidence supports a finding of no more than mild to moderate limitations in his mental functioning. Additionally, there is no evidence of medical treatment, mental health therapy, psychosocial supports, or a highly structured setting that is ongoing and that diminishes symptoms and signs of the claimant's mental disorder with minimal capacity to adapt to changes in his environment or demands that are not already a part of the claimant's daily life. As discussed above, the claimant has engaged in a somewhat normal level of daily activity.
>
> *****
>
> In this case, [the requirements of Listing 12.05B] are not met because the record is devoid of evidence of significantly sub average general intellectual functioning with significant deficits in adaptive functioning manifested by extreme limitation in [the four areas of mental functioning]. In 2012, the claimant had a full scale IQ of 66, indicating a level of intellectual efficiency in the extremely low range to borderline range and his overall adaptive functioning appeared to be in the borderline range, but subsequent records indicate no more than mild to moderate limitation in [the four areas of mental functioning].

(Tr. at 14-15, 17) (record citations omitted). Parks insists that these findings are unsupported by substantial evidence. He argues that the evidence shows he has "marked" limitations (i.e., "seriously limited" functioning) across the three challenged areas of mental functioning. To some extent, Parks appears to be asking the Court to re-weigh the evidence and substitute its own findings for those of the ALJ—something the Court cannot do. *Schmitt v. Kijakazi*, 27 F.4th 1353, 1361 (8th Cir. 2022). However, in reviewing the ALJ's opinion in conjunction with the record as a whole, the Court finds that it contains certain errors and omissions which cast doubt on the sufficiency of the ALJ's analysis.

For example, the ALJ found that "[i]n 2012, [Parks] had a full scale of IQ of 66, indicating a level of intellectual efficiency in the extremely low range to borderline range and his overall

adaptive functioning appeared to be in the borderline range, *but subsequent records indicate no more than mild to moderate limitation[s] . . .*" (Tr. at 17) (emphasis added). However, the ALJ misattributed the year the assessment was conducted—Dr. Wells performed Parks's intelligence testing in 2015, rather than 2012—and thus the "subsequent records" referred to by the ALJ were nearly all dated from *before* that exam was conducted.

In fact, the only later record that the ALJ cites is from the mental status exam that Dr. Terrell conducted in 2020. (Tr. at 271). Exam results on that page alone showed that Parks could not recite his address, phone number, or social security number. He could not name how many weeks were in a year. When asked to name five large cities, he named only California. When asked which states border Arkansas, he answered Mississippi and Little Rock. His thought process showed some loose associations and he struggled with memory and recall. Dr. Terrell concluded that Parks "appear[ed] to be functioning within or near the mentally retarded range" based on "the current findings, educational history, nature of prior work and general level of adaptive functioning." *Id*. In fact, it appears that the only results supporting the ALJ's finding were Parks's normal attire, hygiene, mood, affect, and orientation.

The ALJ draws support from similar notes in Parks's therapy records, finding that Parks "routinely presented as attentive, cooperative, and friendly with appropriate affect and normal flow of thought." (Tr. at 18). Although these findings are accurate, they do not paint the whole picture. The therapy records also demonstrate deficits in adaptive functioning that the ALJ did not address at Step Three or elsewhere in his opinion.

For instance, the records show that Parks went several months without eyeglasses, but he told his therapist, Alex Sprouse, LAC, that he didn't know why he didn't have them. (Tr. at 409). When he finally got new glasses, Ms. Green advised that they would be kept at school for him.

11

Both Ms. Green and Ms. Sprouse also expressed concerns (on multiple occasions) about Parks's medication noncompliance. Often, this was the result of his guardians failing to take him to medical appointments and refill his medications. But Ms. Sprouse had a difficult time even assessing Parks's compliance, noting on one occasion that he "reports forgetting and goes back and forth between take meds daily and not at all. Never could say definitively whether or not he told teacher he wasn't taking meds." (Tr. at 417). Ms. Sprouse suggested keeping and administering his medication at school. (Tr. at 415). Additionally, Parks reported a history of binging or emotional eating, and Ms. Sprouse repeatedly met with school officials because Parks was not eating properly at school. (Tr. at 388, 391, 403-05, 440). Ms. Sprouse noted several times that Parks's "lower mental functioning" made for slow progress in therapy. (Tr. at 371, 374, 376).

The ALJ also gave great weight to Parks's high school grades in evaluating Parks's capacity to understand, remember, or apply information. Elsewhere in the opinion, the ALJ briefly acknowledged that Parks received special education services, but he emphasized that "transcripts from high school show [Parks] was generally a B student, who graduated high school with a cumulative grade point average of 3.58." (Tr. at 19). But the ALJ wholly failed to acknowledge the level of accommodations and support Parks received throughout high school. School records show that Parks required one-on-one or small group instruction; instruction in self-contained special education classrooms for Language Arts, Math, Social Studies, and Science; assistance from a paraprofessional in his general education classes (including visual arts and PE); small group testing with the test and all materials read aloud; reduction of multiple choice, short answer, and essay; extended time to turn in assignments; and frequent reminders to stay on task. (Tr. at 298, 300, 320, 329). The ALJ also failed to acknowledge that Parks's academic abilities had been

12

assessed at lower elementary school levels, even with accommodations—a fact which tends to limit the significance of Parks's high school GPA to the ALJ's analysis.

In each area of mental functioning, the ALJ placed great emphasis on the "wide array of activities of daily living" Parks performed. (Tr. at 18). Yet the only activities the ALJ cited were attending to personal care; preparing microwavable meals; operating and playing video games; watching television; and shopping in stores. *Id*. As far as the Court can tell, Parks's ability to shop in stores is not supported by the record. At most, the record shows that in 2015 he reported that he could go into a gas station and independently pay for gasoline. But his stepfather reported in 2020 that "the family has not done much to help [Parks] conduct ADLs" since his other stepfather's death, and that "they are working on [Parks] going into the store by himself now." (Tr. at 259, 269). This is consistent with Parks's hearing testimony. (Tr. at 33-34). The ALJ's misstatement indicates a failure to properly analyze the degree of support Parks received, as required by the regulations. *See* Listing 12.00F3e; *Nowling v. Colvin*, 813 F.3d 1110, 1121-22 (8th Cir. 2016) ("Simply put, the nature of the medical condition and the nature of the life activities, including such considerations as independence, should be considered against the backdrop of whether such activities actually speak to claimant's ability to hold a job. Participation in activities with family or activities at home and at 'your own pace' may not reflect an ability to perform at work.").

Moreover, even if Parks were able to pay for items independently, these ADLs remain a far cry from a "wide array of activities" as the ALJ describes. The listings specifically explain that "[t]he fact that you engage in common everyday activities, such as caring for your personal needs, preparing simple meals, or driving a car, will not always mean that you do not have deficits in adaptive functioning as required by 12.05B2. . . . We will not assume that your ability to do some common everyday activities, or to do some things without help or support, demonstrates that your

mental disorder does not meet the requirements of 12.05B2." Listing 12.00H3d. A claimant would be hard-pressed to present with fewer independent ADLs than Parks, who by all accounts cannot drive, use the stove, shop for groceries, manage money, pay bills, count change, write, or read well (if at all). Even when considering Parks's capacity to dress and bathe himself, use a microwave, play video games, and watch TV, Dr. Terrell found that Parks had a "limited ability to complete ADLs without assistance," while Dr. Wells found that "[h]is overall adaptive functioning appears to be in the borderline range." (Tr. at 264, 272). There exists little evidence in the record to dispel those opinions, which seem at odds with the ALJ's findings of only "fair" limitations.

Finally, the Court places significance in the ALJ's failure to acknowledge the internally consistent recommendations from Ms. Green, Dr. Wells, and Dr. Terrell that Parks would be best suited for work in a supervised, supportive environment, such as a sheltered workshop. (Tr. at 265, 272, 331). *See Browning v. Colvin*, 766 F.3d 702, 704 (7th Cir. 2014) (explaining that "a person capable of working *only* in sheltered employment is deemed disabled and therefore entitled to receive social security disability benefits").

The ALJ's consideration of the evidence discussed herein is relevant to whether Parks meets Listing 12.05B. And, although Parks doesn't raise the issue on appeal, it is also relevant in determining his RFC. The Court is mindful that "an ALJ is not required to discuss every piece of evidence submitted." *Wildman v. Astrue*, 596 F.3d 959, 966 (8th Cir. 2010). But the ALJ's failure to discuss significant evidence in this case that detracts from his decision, coupled with errors that undermine his analysis, "create sufficient doubt about the ALJ's rationale for denying [Parks's] claims to require further proceedings below." *Willcockson v. Astrue*, 540 F.3d 878, 880 (8th Cir. 2008). The Court therefore reverses the Commissioner's decision and remands this case for further consideration.

## VI. Conclusion:

For the reasons stated above, the Court finds that the Commissioner's decision is not supported by substantial evidence. This case is therefore reversed and remanded for further review.

IT IS SO ORDERED this 25th day of April 2023.

_____
UNITED STATES MAGISTRATE JUDGE